167 N.J. Super. 296 (1979)
400 A.2d 843
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAWRENCE LUNGSFORD, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 1979.
Decided April 4, 1979.
*298 Before Judges CONFORD, PRESSLER and KING.
Mr. Edward A. Halpern argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney for appellant).
Mr. Frank J. Cozzarelli argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney for respondent).
The opinion of the court was delivered by KING, J.A.D.
Defendant was tried before a jury and found guilty of both counts of a two-count indictment charging him with knowing possession of a motor vehicle with an altered serial number for which no verified statement had been filed with the Division of Motor Vehicles within ten days of possession, contrary to N.J.S.A. 2A:127-3, and receiving a motor vehicle known to have been stolen and belonging to James Wilton, contrary to N.J.S.A. 2A:139-3. Post-trial motions for acquittal and a new trial were denied and defendant was sentenced to two concurrent 12-month terms in the Essex County Correction Center.
On April 19, 1975 defendant Lungsford was arrested upon being found in possession of a 1968 Plymouth Road Runner two-door hardtop. The State alleged that the Road Runner was stolen on January 8, 1975 from James Wilton *299 of Edison. The State was unable to produce Wilton at trial to identify the vehicle or testify that it was stolen. Defendant testified at trial that he purchased the car from James Law of Hillside in January 1973. Although he had a title and registration he could not corroborate the purchase. Both sides attempted to locate Law but were unsuccessful. Defendant's appellate claims emphasize the hearsay nature of certain evidence admitted at trial over his objection.
The claims of trial error focus on the manner in which the police attempted to prove that the Road Runner in defendant's possession when he was arrested was the allegedly stolen Wilton vehicle. Some background from the record is necessary for understanding. Automobiles each have at least two, sometimes three, distinguishing numbers which are placed in the car at the point of production. The primary and most visible number is called the vehicle identification number (VIN). This indicates the type, year and make of the car. On the 1968 Road Runner the VIN was riveted to the driver's side of the dashboard. The second number, a confidential serial number, is usually found elsewhere in a permanent component of the car. This confidential number is for the benefit of auto theft investigation. Chrysler Corporation's version of the confidential serial number on this 1968 Road Runner model was called a factory order number and was found underneath the hood stamped into the radiator brace on the driver's side. In this case, a third number, called a packing slip number was placed in the coils of the back seat of the Road Runner.
A car may be traced through any of the numbers. In this case, because the VIN, in the opinion of Detective Walsh of Newark's auto theft squad, did not appear to have been factory-installed, the police requested the National Automobile Theft Bureau (NATB) to factory-trace the car through the factory order number. (Unfortunately, the record is totally uninformative about the nature and function of NATB.) A factory-trace provides the time of manufacture and reveals the zone office where the car was sold, and thus *300 permits the identification of the first owner. From the factory-trace the proper VIN for the vehicle may also be determined. That VIN then may be forwarded to the Division of Motor Vehicles and the current ownership of the car traced through state records.
In the present case the trace of the factory order number stamped on the radiator brace produced an allegedly corresponding VIN which NATB rendered to the Newark police who, in turn, forwarded the VIN to the Division of Motor Vehicles in Trenton. The VIN rendered to Trenton was RM21H8A267488. The Division sent back to Newark the name of the alleged owner, James Wilton, who had reported a like car stolen on January 8, 1975. The record, though unclear, is susceptible of the conclusion that the VIN on the Division's reply did not completely match the number furnished by the NATB  the H was a 2 and the last two digits were 68 rather than 88.
At trial the State alleged that defendant obtained possession of the car stolen from Wilton and then took the VIN tag from a similar model car and screwed it on to the dashboard of the stolen car. The State also contended the packing slip number found in the back seat coils, when traced, proved that the seats came from a stolen 1969 Plymouth. In addition to the various number traces the State produced a criminal investigation report which showed that James Wilton reported his car stolen on January 8, 1975. The incident report contained on obviously incorrect VIN, RMH1H8A267468. Sergeant Barrett of the Edison Police testified that he contacted Wilton by phone within a week of the incident and obtained the correct VIN, RM21H8A267488, which the factory-trace undertaken through the NATB ultimately revealed to be the VIN compatible with the confidential serial number on the radiator brace of the subject Road Runner.
As stated, the State could not locate Wilton; defendant could not locate Law. Defendant testified to the purchase of the Road Runner in January 1973 when he said he received a New Jersey title and registration from Law. Defendant *301 testified that since his acquisition of the vehicle the windshield was broken and the ignition was stolen. He said that when the windshield was smashed the VIN tag was broken loose on one side, thus creating the condition which aroused Detective Walsh's suspicions. Defendant also said he bought new seats from a junkyard, replaced the engine, and put in a new radiator and brace after he bought the car. He did not say when he replaced the radiator. He produced no receipts for these transactions. Because he had allegedly lost the front license plate, defendant had re-registered the car on January 21, 1975 and had received new plates. The car thereafter passed inspection in April even though the registration showed a blue vehicle and the Road Runner was then gray. Defendant testified he had primed the car gray without removing the blue. The VIN on defendant's car was RM21HAG125629, a number incompatible with the model in Detective Walsh's opinion.
In order to attempt to prove its case the State was required to rely on the NATB factory-trace information to establish that the car in defendant's possession when he was arrested was the car reported stolen by Wilton. The NATB information led the police to the Wilton car-theft incident report through the not quite perfect matchup with the Division of Motor Vehicles' VIN information. Although the judge did not permit the State to prove exactly what NATB told Detective Walsh, the entire tracing process in effect was crucial in the State's attempt to link the car in defendant's possession to the allegedly stolen Wilton vehicle. The record, however, contains no information about the probable reliability of the NATB.
Our independent inquiry has provided some background about the NATB which is useful in analyzing the admissibility into evidence of information transmitted by it. The NATB is a nonprofit corporation, national in scope, founded in 1912 and financed by over 500 automobile insurance companies representing 95% of the industry. The companies are assessed for the expense of the NATB's upkeep based on the *302 relative amounts of premium written for physical damage insurance on motor vehicles. The purpose of the organization is in large part to prevent and reduce theft losses of automobiles. NATB assembles and disseminates information on stolen automobiles and assists law enforcement in their identification and recovery. Information on stolen vehicles is routinely sent by member companies to the NATB where it is computer-stored. The NATB is also the automobile industry's approved repository for all vehicle information and identification numbers on all American and some foreign-made cars. Federal and state law enforcement authorities call upon the NATB for information pertinent to investigations directed towards identifying and retrieving stolen cars. The NATB is essentially an informational warehouse, a registry for the industry.
Once Detective Walsh derived the confidential factory code number from the radiator brace on the Road Runner, he was able to set the factory trace machinery in process through the NATB. The information provided by the NATB led him through the state information bank on motor vehicles at Trenton to the report of Wilton's stolen Road Runner, which VIN keyed into the confidential factory number on the radiator brace in defendant's car.
We are constrained to hold that this conviction must be reversed. Although Walsh was not permitted to tell the jury the precise content of the information he received from NATB, his whole process of tracing the identity of the 1968 Road Runner in the Spring of 1975 was dependent thereon. Therefore this critical aspect of the case  this crucial link  was effectively evidential against defendant. Without the use of the NATB process no potential nexus between Wilton's car and defendant's car could have possibly been established. But the record is devoid of any proof of the reliability of the NATB procedures and therefore of any proper evidential basis for admission of data derived therefrom.
*303 In our opinion the NATB procedures for tracing the identification of motor vehicles could properly be held by a trial court to be evidential in a criminal case if compliance with Evid. R. 63 (30) was established. This rule states:
Evidence of a statement of matters of interest to persons engaged in an occupation contained in a list, register, periodical, or other published compilation is admissible to prove the truth of any relevant matter so stated if the compilation is published for use by persons engaged in that occupation and is generally used and relied upon by them.
The qualification of evidence offered under Evid. R. 63(30) must first be decided by the judge pursuant to Evid. R. 8. To satisfy the threshold the judge must be convinced that the compilation is published for use by persons engaged in that occupation and is generally considered useful and reliable. If these conditions are met, statements from the compilation are admissible to prove the truth of the relevant matter stated. Evid. R. 63(30) has been said to effectively overrule the holdings in Crowley v. Homan Co., 3 N.J. Misc. 968, 130 A. 372 (Sup. Ct. 1925) (used car blue book inadmissible), and Horst v. Peter Breidt City Brewery, 94 N.J.L. 230 (Sup. Ct. 1920) (newspaper price quotation not competent evidence without proof of source). New Jersey Rules of Evidence 285 (Gann 1972).
In the Report of the New Jersey Supreme Court Committee on Evidence 211 (1963), which preceded the adoption of our evidence codification by the Supreme Court and the Legislature in 1967, Evid. R. 63 (30) was recommended thusly:
The rationale of the Rule is that the use of such materials is necessary because it is too difficult to call to the witness stand those who have participated in their preparation or compilation. The trustworthiness requirement is satisfied by the requirement that a finding be made by the judge that the material is regularly published for use by persons in a given occupation who rely on it. There is no motive to falsify; on the contrary, there is every reason to be accurate *304 and precise since the success of a business depends on accuracy and reliability.
Dean Wigmore discusses the hearsay exception embraced by Evid. R. 63(30) under the topic, "Sundry commercial and professional registers (stock pedigree, business directory, shipping lists, etc.)," stating:
There are many kinds of registers, records, reports, compilations, and the like, which may in a given case fulfill the requirements already indicated (§ 1692 supra) [necessity and trustworthiness] as sufficient for this exception. A printed pedigree register of blooded animals, for example, made by a person having more or less direct acquaintance with the subject matter, intended to be publicly circulated and consulted by persons interested and informed, tested by their use, and found by their experience to be trustworthy and actually relied upon as the basis of transactions in the trade, is a typical illustration.
The principle, indeed, has large possibilities which have already been recognized, though with due caution, by the courts and in a few statutes. The application of the principle might well be left largely in the hands of the trial court. [6 Wigmore, Evidence (Chadbourne rev. 1976), § 1706 at 49-51]
Wigmore gives numerous examples of the practical utility of the exception, including: Abel v. Potts, 170 Eng. Rep. 602 (K.B. 1800) (Lloyd's register used to prove a capture in an action on a marine policy); Warrick v. Reinhard, 136 Iowa 27, 111 N.W. 983 (Sup. Ct. 1907) (a certificate of registry in the Iowa Breeder's Association admitted on value of a thoroughbred sow); Slocovich v. Oriental Mutual Ins. Co., 108 N.Y. 56, 14 N.E. 802 (Ct. App. 1888) (American Lloyd's and other shipping registers admitted to show the condition, capacity, age and value of ships).
The exception is also contained in the Federal Rules of Evidence § 803(17), effective in 1975, rendering admissible "market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." The Federal Advisory Committee Note on the exception states: *305 "The basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate."
Two New Jersey cases decided before the adoption of the Rules of Evidence in 1967 discuss the common-law exception generally. In Associated Metals, etc., Corp. v. Dixon Chemicals, etc., 82 N.J. Super. 281, 313 (App. Div. 1963), certif. den. 42 N.J. 501 (1964), Judge Goldmann affirmed the admissibility of a periodical named Iron Age, the weekly publication of the steel trade considered by plaintiff's well-qualified expert to be "the bible of the steel industry," to prove recorded warehouse prices for structural steel during a five-year period. State v. Carrano, 27 N.J. Super. 382, 389 (App. Div. 1953), relied upon in Associated Metals, affirmed the admissibility of The Morning Telegraph in a bookmaking prosecution as proof of the racing events of the day stating:
The testimony of the State's experts on the general acceptance of The Morning Telegraph as a responsible periodical "in the trade" would in our opinion warrant the trial court, in its discretion, in finding that the periodical was admissible as a record of the events covered therein.
Since the codification of the rules the only reported New Jersey case discussing Evid. R. 63(30) is State v. McGee, 131 N.J. Super. 292 (App. Div. 1974), a prosecution for bringing a stolen gun into the State. The prosecution relied on a computer report from the National Crime Information Center (N.C.I.C.) that the gun answered a description of a gun reported stolen by the Baltimore Police Department. On appeal the State relied on Evid. R. 63(30) to sustain the admissibility of the hearsay report that the gun was stolen. The State's witness described the N.C.I.C.'s function pertinent to the case as a computer storehouse of reports from police departments throughout the country concerning stolen guns. The McGee court was very chary about the admissibility of the N.C.I.C. report, suggesting that the data stored in its computer was nothing more than an investigative tool, which *306 could not be used as substantive proof. The court in McGee found that the trial judge erred in admitting the N.C.I.C. report under the proofs available, and reversed the conviction, stating:
We believe the trial judge mistakenly exercised his discretion in finding that the data furnished by N.C.I.C. was sufficiently trustworthy to justify its admission. Accepting Lintott's expert testimony of how N.C.I.C. functions, we still do not know (a) how and when the information furnished by the owner of the gun was passed on to the Baltimore police; (b) how and who fed the information into the computer; (c) who programmed the computer and how it was done; how the data was retrieved from the computer; the accuracy of those who operated the computer. Most importantly, the printout supporting the proffered evidence was not produced. Under the circumstances existing here, the evidence should not have been admitted. [at 298]
See also, State in Interest of D.C., 114 N.J. Super. 499 (App. Div. 1971). The McGee court held essentially that the State did not produce enough proof of the reliability of the data supplied by N.C.I.C. in those circumstances for the judge to fairly conclude that it was inherently trustworthy enough to be admitted in a criminal trial.
We conclude that the information before the trial court in the instant case concerning the modus operandi of the NATB was inadequate to permit admissibility under Evid. R. 63(30). If the conditions of admissibility under the rule had been established and the judge had been satisfied at an Evid. R. 8 hearing that the proffer was sufficiently trustworthy, based on the method of compilation and industry reliance, the evidence would have been properly admissible.
We are next compelled to examine defendant's challenge to the admissibility into evidence of S-6, the criminal investigation report of the Edison Police Department, and to a reference in S-7, a supplement thereto. The report and the reference in the supplement were admitted pursuant to Evid. R. 63(13), the "Business Entries" exception to the hearsay rule which states:
*307 A writing offered as a memorandum or record of acts, conditions or events, is admissible to prove the facts stated therein if the writing or the record upon which it is based was made in the regular course of a business, at or about the time of the act, condition or event recorded, and if the sources of information from which it was made and the method and circumstances of its preparation were such as to justify its admission.
The State established that after reasonable inquiry the owner of the allegedly stolen car, James Wilton, could not be located for trial. The report and supplement, S-6 and S-7, contained the information that Wilton allegedly gave to the police immediately after he realized his car was stolen. This was the only evidence in the case establishing that Wilton's car had been stolen. If the report and the reference in the supplement were inadmissible, the State had no case for receiving a stolen vehicle.
The following facts convinced the trial judge that the report was in his discretion sufficiently trustworthy to fulfill the conditions of admissibility under Evid. R. 63(13), i.e., "the sources of information from which it was made and the method and circumstances of its preparation were such as to justify admission."
The State produced Sergeant Barrett of the Edison Township Police Department Auto Theft Bureau to prove the report and that it was compiled in the ordinary course of the Department's business and lodged in its files. The report was actually filled out by a Detective Vittello, who was not produced as a witness, on January 8, 1975 at 10:20 P.M. at the stationhouse. The report contained a summary of the information supplied by James E. Wilton, Jr., who stated he lived at 30 Mt. Pleasant Avenue, Edison, and was employed by Oaktree Ceramics of Iselin. He reported to Detective Vittello that between 8 and 10 P.M. on the evening of January 8 his 1968 Plymouth two-door Road Runner, color gray prime, state registration 718 BFU, had been stolen from the parking lot of the Sunnyside Delicatessen on Oaktree Road. Wilton declared the value of the car at $500 and gave a vehicle identification number of RMHIH8A267468.
*308 Detective Vittello recorded in handwriting the following statement on the report as taken from the victim:
Victim stated that between the above times someone stole the above described vehicle from where it was parked at the above location. The vehicle is unregistered at this time but it displays New Jersey plates on it which are unknown at this time. Victim stated he has the keys but the registration is in the vehicle. The vehicle was not locked. Approximate value of the vehicle is $500.00.
Sergeant Barrett testified that the auto theft reports are routinely filled out contemporaneously with the complaint and are kept in the department's files. When reviewing the report about a week later, apparently pursuant to his special duties, Barrett observed that the VIN as recorded could not be accurate because of the sequence of numbers and letters. Barrett then called the owner on the phone and obtained a corrected VIN. Barrett had known the 22-year-old Wilton since Wilton's high school days and had seen or spoken to him frequently about town before the theft complaint. Barrett was also familiar with the subject vehicle and had seen it the day before it was missing, observing it was gray prime in color. The corrected VIN number Barrett obtained was RM21H8A267488, which keyed with the confidential identification number discovered by Detective Walsh on the radiator bracket of defendant's car. This corrected VIN number was personally recorded by Barrett on S-7, the supplemental report.
The trial judge admitted the investigation report, S-6, and Barrett's testimony about the corrected VIN from S-7, stating:
Under the circumstances where the witness is unavailable, where this record is kept in an ordinary course of business, where it's the report of a crime and necessary to establish not the identification of the defendant or some other essential element but merely that the car was stolen that there is a degree of reliability which would warrant admissibility.
*309 In our view the trial judge erred in holding that this hearsay of Wilton was admissible under the business records exception. While police records may qualify as business records for certain purposes and in certain respects, they are nevertheless not vehicles by which substantive evidential status may be conferred upon the otherwise hearsay declarations of a victim of or witness to a crime, accident or other occurrence. If the declarant is not available to testify and if the statement is not admissible under some other exception to the hearsay rule, such as excited utterance or dying declaration, then admissibility cannot be predicated exclusively upon the circumstance that the statement was made to a police officer who paraphrased its content in his report.
Our reason for this conclusion lies in the essential rationale of the business records exception, now codified by Evid. R. 63(13). As explicated by this court in Fagan v. Newark, 78 N.J. Super. 294, 309 (App. Div. 1963), the exception was "founded upon the twin principles of reliability and necessity." Originally conceived as an aid to commercial litigation, the theory of the exception is that records made in the usual course of business "normally possess a circumstantial probability of trustworthiness." Mahoney v. Minsky, 39 N.J. 208 (1963). But it is clear that one of the critical circumstances importing reliability is the fact that the informant whose declaration is so recorded is under a duty, in the context of the activity in which the record is made, to make an honest and truthful report. Thus, the business record exception is predicated not only on the circumstance that the record itself is kept in the usual course of the business but also on the circumstance that the recorded information is obtained by the recorder from a declarant having a "business" duty to communicate it truthfully. See, e.g., State v. Taylor, 46 N.J. 316, 330-331; State v. McGee, 131 N.J. Super. 292, 297 (App. Div. 1974); Fagan v. Newark, supra, 78 N.J. Super. at 319.
*310 Both of these criteria, namely, the recording of the information in the usual course of the business activity and the providing of that information by a declarant whose duty it is to supply it truthfully, must be met before the trial judge is free to exercise his discretion in admitting or excluding the business entry based upon his ultimate evaluation of its reliability. Here, the second of these criteria was not met. Obviously, the making of investigations and the receiving of information concerning crime is usual police business. Hence a police record is admissible to prove, for example, that a report of crime was made by a member of the public and when the report was made and received. It is not, however, admissible to prove the truth of the contents of that report since members of the public, whether targets of investigation, witnesses or victims, are not under a duty, in the nature of a business duty, to make an honest and truthful report. Thus, such "citizen" declarations are virtually universally held to constitute excluded hearsay in respect of otherwise admissible police reports. See, e.g., United States v. Graham, 391 F.2d 439 (6 Cir.1968); United States v. Shiver, 414 F.2d 461 (5 Cir.1969); United States v. Burruss, 418 F.2d 677 (4 Cir.1969). And see, generally, Annotation, "Police reports as business records," 77 A.L.R.3d 115 (1977); Annotation, "Admissibility of police reports," 31 A.L.R. Fed. 457 (1977). See Contra, People v. Giesa, 71 Misc.2d 506, 337 N.Y.S.2d 233 (Crim. Ct. 1972), and People v. Meyers, 72 Misc.2d 1003, 340 N.Y.S.2d 505 (Crim. Ct. 1973).
The trial judge here evidently admitted the police report as proof of the truth of Wilton's declaration because of his personal belief that it was probably true. If, however, a hearsay declaration does not meet the threshold test of circumstantial reliability applicable to its category of hearsay exception  in this instance the declarant's business duty  the probable trustworthiness of a particular hearsay declaration is irrelevant.
Reversed.