**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2811-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CHRISTOPHER POOLE, a/k/a
CHRISTOPH POOLE, and
JARRED HAWTHORNE,

    Defendant-Appellant.

_____

Argued March 16, 2022 – Decided June 22, 2022

Before Judges Sabatino, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 18-07-2212.

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Caroline C. Galda,

Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Christopher Poole appeals his convictions and sentence for first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2), second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A 2C:39-4(a), arguing:[1]

I. THE LEAD DETECTIVE'S REPEATED IDENTIFICATIONS OF DEFENDANT AS THE SHOOTER ON THE VIDEO AND HIS OPINION THAT DEFENDANT "MATCHED" THE DESCRIPTION OF THE SHOOTER GIVEN BY EYEWITNESSES WAS INAPPROPRIATE, PREJUDICIAL, AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

II. ADMISSION OF OTHER-BAD-ACT EVIDENCE THAT DEFENDANT POSSESSED CONTROLLED DANGEROUS SUBSTANCES AND PACKAGING MATERIALS USED TO DISTRIBUTE CONTROLLED DANGEROUS SUBSTANCES WAS IRRELEVANT, INADMISSIBLE, AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

III. THE LEAD DETECTIVE'S SPECULATION THAT PEOPLE DID NOT "COOPERATE" WITH THE POLICE BECAUSE THEY WERE AFRAID OF DEFENDANT WAS BASELESS,

---

[1] We have reorganized defendant's point headings to reflect the order in which we discuss each issue in our opinion.

A-2811-19

PREJUDICIAL, AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

IV. HEARSAY TESTIMONY THAT THE EYEWITNESSES WERE "CONFIDENT" IN THEIR IDENTIFICATIONS, DESPITE THEIR CONFIDENCE LEVEL NOT BEING RECORDED IN THEIR OWN WORDS DURING THE IDENTIFICATION PROCEDURE, WAS INAPPROPRIATE, PREJUDICIAL, AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

V. EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

VI. DEFENDANT'S LIFE SENTENCE, IMPOSED FOR AN OFFENSE COMMITTED WHEN HE WAS [TWENTY-FOUR], IS EXCESSIVE.

We have reviewed and considered each of these arguments in light of the entire record and applicable law. Although the errors identified by defendant, which were not objected to at trial, may not independently rise to the level of plain error, an issue which we do not address, we are satisfied that their cumulative effect clearly deprived him of a fair trial mandating that we reverse his conviction and remand for a new trial. In light of that determination, we do not reach defendant's argument challenging his sentence.

3

I.

The following facts were adduced at defendant's trial. On the morning of April 26, 2018, Rasheed Olabode left his home in Newark with his two roommates, Taiwo Fadare and Oyindamola Giwa. They planned to pick up a cellphone from a repairman and get something to eat afterwards. Olabode initially drove to the repairman's house, but upon discovering that he was not home, proceeded to his shop.

Afterwards, the group headed toward a restaurant where they planned to eat. On the way, Olabode had a strong urge to urinate and decided to stop and relieve himself beside the car. He attempted to pull over on 18th Street in Newark but was unable to because the road was blocked off. He then proceeded to South 20th Street, where he pulled over and exited the vehicle.

Shortly after, Olabode began speaking with a man, later identified as Solomon Fitzgerald, and the pair crossed the street. At that point, a second man, subsequently identified as defendant, briefly entered 765 South 20th Street and then joined Olabode and Fitzgerald on the sidewalk. Fadare and Giwa both observed Olabode as he appeared to "plead" or "beg" for something with his hands in a prayer position. Fadare and Giwa testified that defendant then took

4

out a pistol and shot Olabode in his chest. Defendant then ran toward the rear of 765 South 20th Street.

Fadare moved to the driver's seat of the car and, after Olabode was able to return to the vehicle, Fadare, Giwa, and Olabode drove to get medical assistance. On the way, Fadare saw a police vehicle, prompting him to stop the car. He spoke to Officer Carlos Colon who called for an ambulance. The ambulance arrived shortly thereafter and transported Olabode to a hospital, where he was pronounced dead.

The same day, Detective Kevin Green visited the area where Olabode had been shot. There, he observed a ".9 millimeter . . . shell casing . . . directly in front of 763 South 20th Street," which was "directly next door" to 765 South 20th Street.

Detective Green obtained a statement from Dorothy Hall, defendant's grandmother, who lived on the second floor of 765 South 20th Street. She explained that defendant lived with her and that his father lived on the first floor. She stated defendant was at the house at the time of the shooting, but was "downstairs," and that she spoke to him "ten [or] fifteen minutes" after the shooting. Hall also described defendant's appearance that day. She stated that

he was wearing a "yellow hat" and a yellow long-sleeved shirt and described that defendant had facial hair.

Detective Green also discovered and collected a bag located in the stairwell leading to the second floor of 765 South 20th Street next to mail addressed to defendant. It contained one bag of marijuana, and several "glassine bags," which Detective Green understood were "used for packaging [controlled dangerous substances]."

After examining the scene of the shooting, Detective Green obtained statements from Fadare and Giwa, who had been transported to the police station. In those statements, Fadare and Giwa both identified 765 South 20th Street as the house in front of where Olabode was shot. Giwa also described the shooter as wearing what he believed to be a gray-colored hoodie and having a beard. Fadare did not provide a description of the shooter's clothing. After speaking to Fadare and Giwa, Detective Green suspected that defendant might be the shooter.

On April 27, 2018, Detective Green obtained video from a surveillance camera located several houses away from 765 South 20th Street that provided a blurry depiction of the shooting. The next day, Fadare and Giwa returned to the police station. There, each individual participated in a photo array identification

6

procedure conducted by detectives who were not familiar with the case. Fadare and Giwa both viewed six photos and selected defendant's photo as the person who shot Olabode.

Detective Green later requested and obtained an arrest warrant for defendant. Detective Green attempted to determine defendant's location by tracking his cellphone, but was unable because his phone had been turned off. Likewise, Detective Green was unable to locate defendant in the area of South 20th Street. Defendant was eventually arrested several weeks later.

Prior to trial, defense counsel requested a Wade[2] hearing to determine the admissibility of the photo array, claiming the procedures were impermissibly suggestive. The court rejected the application, reasoning that law enforcement properly conducted the array via "blind administration" with detectives who had no knowledge of the case, and presented photos that looked very similar "in terms of age and complexion," and all showed African American males. Further, the police properly covered up defendant's tattoos on his face and neck and did the same for all photos in the array. The court concluded that there was no reason to hold a Wade hearing, reasoning that law enforcement did "an excellent

---

[2] United States v. Wade, 388 U.S. 218 (1967).

A-2811-19

job of constructing the photo array and there [was] absolutely nothing whatsoever that [was] the least bit suggestive."

At trial, the State's proofs included testimony from Fadare, Giwa, Officer Colon, Hall, Detective Green, and Special Agent John Hauger, an expert in historical cell site data analysis. Further, the State presented the surveillance video depicting the shooting, an audio recording of Hall's April 26, 2018 statement to Detective Green, and audio-visual recordings of the photo identification procedures in which Fadare and Giwa participated.

The first two witnesses presented at trial were Fadare and Giwa. During their testimony, Fadare and Giwa each identified defendant as the person who shot Olabode. The State played the surveillance video during both witnesses' testimony, and Fadare specifically identified defendant as appearing in the video. Giwa acknowledged, however, that he and Fadare were "in shock" following the shooting.

Fadare and Giwa also testified as to their participation in the photo identification procedures and the State inquired about their level of certainty that the photo they selected depicted the person who shot Olabode. Fadare stated he was "very sure that was the individual who did it" and that he did not "have

8 A-2811-19

any doubts." Likewise, when asked if he had "any doubt" that defendant was "the man who shot . . . [Olabode]," Giwa stated "I saw his face. He's the one."

On cross-examination, defense counsel asked Fadare and Giwa about the shooter's appearance. Fadare described the shooter as wearing a hoodie but was unsure of the hoodie's color, the shooter's height, or whether the shooter had facial hair. Giwa stated the shooter wore a hoodie and had facial hair "[a]ll around his face," but did not know the color of the hoodie, whether the shooter wore a hat or glasses, or the color of the gun. He also acknowledged that his opportunity to view the shooter was brief. Finally, Fadare and Giwa both denied defense counsel's suggestion that Olabode stopped on 20th Street to purchase marijuana.

Officer Colon testified next and discussed his encounter with Olabode, Fadare, and Giwa, following the shooting. He described Fadare and Giwa as being "in a state of shock" and "nervous," and stated that Fadare was "hysterical" and "confused."

When the State called Hall to testify, she disavowed her April 26, 2018 statement. Specifically, she claimed she did not see defendant on the day of the shooting and that the yellow shirt she described was actually what he wore the

9

previous day.  After conducting a <u>Gross</u>[3] hearing, the court permitted the State

to play Hall's prior statement for the jury.

Detective Green also testified for the State.  He began by describing his

arrival at the scene of the shooting and his initial investigation, and stated that

he observed a surveillance camera in the area.  When asked "what type of means"

he had to use to obtain the surveillance footage, he stated "[everyone] . . . on

that street was not cooperative at all.  Didn't want to talk to the police.  Didn't

want to provide any assistance" and, as such, he had to request a search warrant

"because, again, no one wanted to cooperate."

Detective Green continued to describe why the South 20th Street residents

all refused to cooperate with his investigation.  He stated:

> Usually when that happens and it's for one of two
> reasons . . . in my investigative experience, and I've
> been doing this for a pretty long time.  <u>Either you know
> the individual or you have fear that the individual
> knows you and will come back and do something to
> you.</u>
>
> When I say know him, that means you have a personal
> relationship with him or you know of the individual and
> you want nothing to do with the situation, so you kind
> of shy off.  Either that or you had a bad experience with
> the police.  It's going to be one of . . . the three.

---

[3]  <u>State v. Gross</u>, 121 N.J. 1, 7-9 (1990).

No one on that block wanted to talk. They all shut down. Closed. Don't ring my doorbell. Don't call me. Don't come. Don't try to contact. No, I'm not giving you my information. Leave me alone.

[(emphasis added).]

As Detective Green continued to discuss his investigation of the scene, he described the bag he collected from 765 South 20th Street. He first stated that he collected the bag from "the hallway leading up to the second floor of 765 South 20th [Street]." The State then presented a photo of the contents of the bag and Detective Green stated "this is packaging for [controlled dangerous substances]" and described "these glassine bags [are] used for packaging [controlled dangerous substances]." The State then presented the contents of the bag. Detective Green stated, "This is the actual contents that was shown in the photograph there. It has the nine bags of drug paraphernalia, as I call it, and along with the . . . one bag of marijuana." He also described that the Union County Drug Lab determined that the bag contained "actual marijuana." The State moved the contents of the bag into evidence without objection.

The State then inquired why Detective Green never charged defendant with possession of marijuana. He stated:

I'm a homicide detective. I've already charged him with murder, possession of a weapon, possession unlawful purpose. I felt the narcotics was fruitless. I mean,

11

you're charging a man with murder. He's on trial for his life for murder and you're going to charge him with one bag of marijuana? No. I'm the murder police.

[(emphasis added).]

Detective Green then provided his opinion as to why he suspected defendant to be the shooter. He stated that after speaking with Fadare and Giwa on the day of the murder he "began to believe that the individual responsible for the incident came out of 765 South 20th Street and the only one that matched . . . the description that they were giving me was [defendant]," and that "they described [defendant] as if he's sitting right now."

The State then asked Detective Green about the surveillance video he obtained. He stated that it "[s]hows the victim, at some point, go across the street and approach the individual, later determined to be Mr. Poole, . . . at which point Mr. Poole pulls out a weapon and shoots him." The State then clarified:

PROSECUTOR: Now, at this point, you're viewing the video. You kept using the word -- the name Mr. Poole. Did you know specifically that was Mr. Poole at this time?

DETECTIVE GREEN: No.

PROSECUTOR: But, of course, you had your suspicions?

DETECTIVE GREEN: Correct.

A-2811-19

The State then played the surveillance video again.  As the video began,

Detective Green stated:

> If you notice, there's people standing outside.  They're all in the same opposite side of the street. . . .  <u>I began to understand why no one . . . would talk to us, because all these individuals were out there and they saw what transpired, and they probably know Mr. Poole.  That's why . . . they were shutting down</u>, not talking to us.
>
> [(emphasis added).]

Upon the shooter's appearance in the video, Detective Green stated, "that's

Mr. Poole."  Shortly thereafter the following exchange occurred:

> DETECTIVE GREEN:  Now he gets closer.  Now I can see him.  He's still far away.  That's Mr. Poole.
>
> PROSECUTOR:  Now, of course, the video is far away and blurry?
>
> DETECTIVE GREEN:  Yes.
>
> PROSECUTOR:  You can't --
>
> DETECTIVE GREEN:  I can't see his face.
>
> PROSECUTOR:  Uh-huh.
>
> DETECTIVE GREEN:  But I can see the clothing.  <u>The clothing that he's wearing is the same clothing described by Ms. Hall.  Had that yellow shirt.</u>
>
> [(emphasis added).]

Detective Green then stated "As you can see here, this individual is wearing that yellow shirt. He has a hoodie jacket on top of it, but the shirt inside of it is yellow."

Detective Green also testified regarding the photo array identification procedures in which Fadare and Giwa participated. In doing so, Detective Green described reports authored by the detectives who conducted the photo arrays. Specifically, Detective Green testified that the detective who conducted Fadare's procedure reported that Fadare was "calm and . . . sure of his selection," and the detective who conducted Giwa's procedure reported that Giwa was "calm and confident with his selection."

On cross-examination, defense counsel again played the surveillance video and questioned Detective Green regarding his ability to identify defendant as the shooter in the video. After a series of questions, the following exchange occurred:

> DETECTIVE GREEN: That person is Christopher Poole. And that person shoots him. Christopher Poole.
>
> DEFENSE COUNSEL: But you don't know at this point its Christopher Poole?
>
> DETECTIVE GREEN: <u>Oh, yes, I do. In fact (inaudible) Christopher Poole.</u>
>
> DEFENSE COUNSEL: How do you know that?

DETECTIVE GREEN: I followed the same . . . individual that had that yellow shirt described by grandma. Back to the house . . . . Gets a gun and comes out. <u>That person identified as Christopher Poole, wearing that yellow shirt, shot the victim.</u>

[(emphasis added).]

Detective Green also acknowledged that the gun used in the shooting was never recovered despite his execution of a search warrant at 765 South 20th Street, nor were any fingerprints incriminating defendant found.

On redirect examination, Detective Green clarified that his identification of defendant as the shooter depicted in the surveillance video was based on what he could see in the video combined with the information he obtained from Hall and Giwa. The State then asked Detective Green, "Now, you're in no way saying that you could tell by this blurry photo, just by itself, that that's Mr. Poole?" Detective Green confirmed that he could not, and stated that his identification was based on the "[t]otality" of the information he had.

Finally, Special Agent Hauger testified regarding his analysis of defendant's cell phone records. He stated that defendant was in the "general geographic area" of 765 South 20th Street on the morning of the shooting and that defendant's phone last connected to a cell tower at 2:46 p.m. that day.

A-2811-19

In summation, defense counsel described that Fadare's and Giwa's descriptions of the shooter were vague and inconsistent in certain aspects. Further he noted that neither witness described the shooter as wearing yellow, as Hall stated defendant was wearing on the day of the shooting, nor could the shooter be identified as wearing yellow in the surveillance footage. Defense counsel also recounted Officer Colon's testimony describing that Fadare and Giwa were "in shock, confused, and nervous" following the shooting.

In its closing statement, the State acknowledged that the surveillance video was "fuzzy," shot from "eight houses down," and appeared to be "shot with a potato." It specifically stated it did not expect the jury to "find this man guilty just based on that video alone." Instead, it argued that the video combined with the other evidence in the case demonstrates that "[t]here's only one person that . . . fits and that's the defendant." The court then provided instructions to the jury including instructions regarding how to evaluate Fadare's and Giwa's identifications of defendant.

The jury found defendant guilty of all three charges. The court merged defendant's second-degree possession of a weapon for an unlawful purpose offense with his first-degree murder offense. It then sentenced defendant to a life sentence subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, for his

16

murder conviction, and a concurrent ten-year sentence with five years of parole ineligibility for his second-degree unlawful possession of a handgun conviction. This appeal followed.

## II.

In his first point, defendant argues, relying on State v. Singh, 245 N.J. 1 (2021), that Detective Green's in-court identification of defendant amounted to an improper lay opinion and violated his "right to due process and a fair trial." Specifically, defendant identifies several portions of Detective Green's testimony in which he stated that defendant was the shooter depicted in the surveillance video, the shooter in the video wore the same clothing Ms. Hall described defendant as wearing, and defendant matched the description of the shooter provided by the eyewitnesses.

Further, defendant cites State v. Frisby, 174 N.J. 583, 593 (2002) and Neno v. Clinton, 167 N.J. 573, 586-87 (2001) for the proposition that "a detective's unambiguous naming of the defendant as the person shooting in the video would hold great weight with the jury." We agree with defendant that, when considered in its entirety, Detective Green's trial testimony constituted improper and prejudicial lay opinion testimony.

"A trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion." State v. Nantambu, 221 N.J. 390, 402 (2015). We "will not substitute [our] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" State v. Garcia, 245 N.J. 412, 430 (2021) (quoting State v. Medina, 242 N.J. 397, 412 (2020)). This court also defers to a judge's findings based on video recording or documentary evidence that is available for review. State v. S.S., 229 N.J. 360, 379 (2017).

However, "[w]hen a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard. Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" Singh, 245 N.J. at 13 (quoting R. 2:10-2). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" Id. at 13-14 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (internal quotations omitted)). In addition, "trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974).

Recently, in Singh, our Supreme Court addressed the requirements of lay opinion testimony. 245 N.J. at 14. The Court began its analysis by examining the purpose and boundaries of N.J.R.E. 701, which provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

See also State v. Watson, ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 83-102).

The Court made clear "that '[t]he purpose of N.J.R.E. 701 is to ensure that lay opinion is based on an adequate foundation.'" Singh, 245 N.J. at 14 (alteration in original) (quoting State v. Bealor, 187 N.J. 574, 586 (2006)). "Accordingly, lay opinion testimony can be admitted only 'if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function.'" Ibid. (quoting State v. McLean, 205 N.J. 438, 456 (2011)).

N.J.R.E. 701(a) first "requires the witness's opinion testimony to be based on the witness's 'perception,' which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Ibid. (quoting

19

McLean, 205 N.J. at 457). "[U]nlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 27 (alteration in original) (quoting McLean, 205 N.J. at 460). N.J.R.E. 701(b) requires that the witness's opinion testimony be "limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 15 (quoting McLean, 205 N.J. at 458).

The principles discussed in Singh are directly applicable to our analysis here. In that case, the lead detective testified while the State played a surveillance video of the robbery for which the defendant was on trial, and he twice referred to the individual shown in the video as "the defendant." Id. at 17. The defendant argued that the detective's "narration" of the video was improper because he "lacked personal knowledge of what the video showed," and his testimony was "not helpful to the jury because the jury was in the same position to evaluate the footage." Id. at 11.

The Court concluded that the detective's references to the person shown in the video as "the defendant" instead of "the suspect" were in error, but reasoned that these references were "fleeting," and therefore "not so prejudicial

20 A-2811-19

as to meet the plain error standard." Id. at 18.  The Court stressed, however, that "in similar narrative situations, a reference to 'defendant,' which can be interpreted to imply a defendant's guilt -- even when, as here, they are used fleetingly and appear to have resulted from a slip of the tongue -- should be avoided in favor of neutral, purely descriptive terminology such as 'the suspect' or 'a person.'"  Ibid.

Here, Detective Green's testimony identifying defendant as the shooter depicted in the surveillance video was improper because it was not based on "personal knowledge of what the video showed" and was "not helpful to the jury because the jury was in the same position to evaluate the footage."  Id. at 11.  The testimony also was not "fleeting," as Detective Green repeated his identification several times.  Id. at 18.

Further, Detective Green's inappropriate identification testimony was highly prejudicial.  The outcome of the trial turned on the State's ability to prove defendant's identity as the man who shot Olabode.  Although its proofs of that critical fact were strong in certain aspects, multiple shortcomings were revealed at trial.  For example, Fadare and Giwa provided vague descriptions of the shooter and did not reference him wearing yellow, Giwa and Officer Colon described that Fadare and Giwa were in "shock" following the shooting, and

Hall repudiated her prior statement placing defendant at the scene and describing his clothing.

By repeatedly testifying that defendant was the shooter depicted in the video and that he could recognize the shooter as wearing a yellow shirt under a hooded sweatshirt, Detective Green inappropriately and significantly bolstered the State's case against defendant. We acknowledge that Detective Green attempted to qualify his testimony by describing that his identification of defendant was not based solely on the surveillance video, however, we find those statements were insufficient to alleviate the prejudicial effect of his repeated and zealous identification of defendant.

III.

Defendant next argues Detective Green's testimony that defendant possessed marijuana and associated packaging materials constituted improper introduction of "other-bad-act evidence" and deprived him of his due process and fair trial rights. He contends that it was never proven that he owned the marijuana and, in any event, it "was not relevant to any material issue in dispute." Further he claims the evidence was prejudicial and capable of producing an unjust result because "[i]nappropriately establishing that [defendant] was a drug dealer . . . raises the specific likelihood, in the mind of

22

the jury, that he possessed a weapon and was likely to use it violently," and the judge failed to instruct the jury regarding the proper use of the evidence.

The State counters that defense counsel opened the door to this evidence when he asked both eyewitnesses whether Olabode drove to South 20th Street to buy marijuana, rather than to relieve himself. We agree with defendant that the testimony was improper, and even if defense counsel opened the door, the testimony was highly prejudicial and the court should not have permitted the jury to consider the evidence, and certainly not without a limiting instruction.

N.J.R.E. 404(b) allows for the admission of evidence of other crimes or wrongs for one of the reasons delineated in the rule — proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident — but not "to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." "'[B]ecause N.J.R.E. 404(b) is a rule of exclusion rather than a rule of inclusion,' the proponent of evidence of other crimes, wrongs or acts must satisfy a four-prong test." State v. Carlucci, 217 N.J. 129, 140 (2014) (quoting State v. P.S., 202 N.J. 232, 255 (2010)). Under this test, commonly known as the Cofield test, to be admissible under N.J.R.E. 404(b), the evidence of the other crime, wrong or act: (1) "must be admissible as relevant to a material

issue"; (2) "must be similar in kind and reasonably close in time to the offense charged"; (3) "must be clear and convincing"; and (4) its probative value "must not be outweighed by its apparent prejudice." State v. Cofield, 127 N.J. 328, 338 (1992).

To satisfy the first prong of Cofield, the evidence must have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." See N.J.R.E. 401 (defining "[r]elevant evidence"). The evidence must also concern a material issue, "such as motive, intent, or an element of the charged offense." State v. Rose, 206 N.J. 141, 160 (2011) (quoting P.S., 202 N.J. at 256). Under Cofield, an issue is material if "the matter was projected by the defense as arguable before trial, raised by the defense at trial, or was one that the defense refused to concede." Ibid. (quoting P.S., 202 N.J. at 256).

Proof of the second prong is not required in all cases, but only in those that replicate the facts in Cofield, where "evidence of drug possession that occurred subsequent to the drug incident that was the subject of the prosecution was relevant to prove possession of the drugs in the charged offense." State v. Barden, 195 N.J. 375, 389 (2008) (quoting State v. Williams, 190 N.J. 114, 131 (2007)).

24

The third prong requires clear and convincing proof that the person against whom the evidence is introduced actually committed the other crime or wrong. Carlucci, 217 N.J. at 143. "[T]he prosecution must establish that the act of uncharged misconduct . . . actually happened by 'clear and convincing' evidence." Rose, 206 N.J. at 160 (quoting Cofield, 127 N.J. at 338).

Last, the fourth prong is "generally the most difficult part of the test." Barden, 195 N.J. at 389. "Because of the damaging nature of such evidence, the trial court must engage in a 'careful and pragmatic evaluation' of the evidence to determine whether the probative worth of the evidence is outweighed by its potential for undue prejudice." Ibid. (quoting State v. Stevens, 115 N.J. 289, 303 (1989)). The analysis incorporates balancing prejudice versus probative value required by N.J.R.E. 403, but does not require, as does N.J.R.E. 403, that the prejudice substantially outweigh the probative value of the evidence. State v. Reddish, 181 N.J. 553, 608 (2004). Rather, the risk of undue prejudice must merely outweigh the probative value. Ibid.

Admitting evidence of other crimes, wrongs or acts is left to the discretion of the trial judge. State v. Marrero, 148 N.J. 469, 483 (1997); State v. Crumb, 307 N.J. Super. 204, 232 (App. Div. 1997). As with other evidential rulings by a trial judge, our scope of review is limited. State v. Foglia, 415 N.J. Super.

106, 122 (2010). "However, if the trial court admits evidence of other bad acts without applying the four-step Cofield analysis, the trial judge's determination does not receive deference and the reviewing court reviews the issue de novo." State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010).

The "opening the door" doctrine is a "rule of expanded relevancy" through which otherwise irrelevant or inadmissible evidence may sometimes be admitted if the "opposing party has made unfair prejudicial use of related evidence." State v. James, 144 N.J. 538, 554 (1996); see also Hemphill v. New York, 595 U.S. ___, 142 S. Ct. 681, 691 (2022) (describing the "door-opening principle" as "a substantive principle of evidence that dictates what material is relevant and admissible in a case" and "requires a trial court to determine whether one party's evidence and arguments, in the context of the full record, have created a 'misleading impression' that requires correction with additional material from the other side.")

In criminal cases, the doctrine "operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context." James, 144 N.J. at 554. The doctrine is limited

by N.J.R.E. 403, thus, evidence to which a defendant has "opened the door" may still be excluded if a court finds that its probative value is substantially outweighed by the risk of undue prejudice. Ibid.

Here, the evidence suggesting that defendant possessed marijuana and associated packaging materials was not offered for any of the permitted uses of such evidence provided in N.J.R.E. 404(b) and clearly failed to satisfy the Cofield test and, therefore, should not have been admitted. The evidence was not "relevant to a material issue," and the State failed to establish that the marijuana actually belonged to defendant. Cofield, 127 N.J. at 338. Further, the evidence lacked probative value and presented a considerable risk of prejudice, given the common association between drug dealing and violence involving firearms. Ibid.; see also State v. Rodriguez, 466 N.J. Super. 71 (App. Div.), leave to appeal denied, 247 N.J. 234 (2021) ("The Legislature has recognized that given the violence associated with the illicit drug trade, there are special dangers posed by drug dealers who have access to firearms."). Likewise, the lack of probative value and risk of prejudice associated with the evidence should have precluded its admission despite defense counsel arguably "opening the door" by asking Fadare and Giwa whether Olabode stopped at 20th Street in hopes of purchasing marijuana. James, 144 N.J. at 554; N.J.R.E. 403.

IV.

Defendant argues further that Detective Green's testimony that defendant's neighbors refused to cooperate with the investigation because they were afraid of defendant was unduly prejudicial and gave the impression that defendant "was such a dangerous person that he could silence whole neighborhoods." He claims the testimony was speculative, not based on facts in the record, an inappropriate lay opinion, and suggestive that [defendant] was a dangerous or threatening person, in violation of N.J.R.E. 404(b)." Again, we agree.

Lay witnesses are permitted to describe "what [they] did and saw," but not about what they "believed, thought or suspected." McLean, 205 N.J. at 460. We have cautioned that "if the lay opinion is presented by a testifying police officer, courts should exercise discretion to prevent jurors from unduly relying on the views of that law enforcement official." State v. Gerena, 465 N.J. Super. 548, 568 (App. Div. 2021). Further, "the lay witness should not cross into the realm of expert opinion that entails . . . specialized knowledge." Ibid. A witness relying on "'his training and experience' to 'testify about his belief as to what happened' strongly suggests" that the witness is providing an expert opinion subject to N.J.R.E. 702. State v. Derry, ___ N.J. ___, ___ (2022) (slip op. at 26) (quoting McLean, 205 N.J. at 462).

Detective Green's testimony on this issue was highly improper. His opinion as to why defendant's neighbors refused to cooperate with his investigation exceeded the bounds of an appropriate lay opinion, see McLean, 205 N.J. at 460; Derry, ___ N.J. ___ (slip op. at 26), and his insinuations regarding defendant's general violent nature were speculative and not based on facts in the record. Further, when considered in combination with his improper narration of the surveillance video, Detective Green's comments that the South 20th Street residents' failure to cooperate with his investigation suggested that they knew the shooter and feared that he would "come back and do something to [them]," and that the residents were "shutting down" because "all these individuals . . . saw what transpired, and . . . probably know [defendant]," clearly implied that defendant was known to be a violent individual and likely committed the murder.

V.

Defendant next argues that the admission of testimony describing Fadare's and Giwa's confidence in their out-of-court identifications of defendant also constituted plain error. First, he claims Detective Green's testimony describing the reports of the detectives who conducted the photo array procedures was inadmissible hearsay and violated the Confrontation Clause. Second, he argues

that admitting the testimony was erroneous because "neither eyewitness's confidence was recorded in his own words at the time the identifications were made, as required by State v. Henderson, 208 N.J. 208 (2011)." Finally, defendant claims the error was "compounded" because Fadare and Giwa were asked at trial about their confidence in their identifications after they had been exposed to confirmatory feedback. We, again, agree that admission of this testimony was improper.

"Out-of-court statements offered to prove the truth of the matter asserted are hearsay." State v. White, 158 N.J. 230, 238 (1999) (citing N.J.R.E. 801). "Hearsay evidence [is] considered untrustworthy and unreliable," ibid., and "is not admissible except as provided by the . . . rules [of evidence] or by other law." N.J.R.E. 802. There are several exceptions to the hearsay rule, which "are justified on the ground that 'the circumstances under which the statements were made provide strong indicia of reliability.'" White, 158 N.J. at 238 (quoting State v. Phelps, 96 N.J. 500, 508 (1984)).

One such exception is the "business records" exception found in N.J.R.E. 803(c)(6), which provides:

> The following statements are not excluded by the hearsay rule . . .

(6) RECORDS OF REGULARLY CONDUCTED ACTIVITY. A statement contained in a writing or other record of acts, events, conditions, and subject to [N.J.R.E.] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

This exception does not apply if the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

The Supreme Court has reaffirmed the standards governing the admissibility of business records:

In order to qualify under the business record exception to the hearsay rule, the proponent must satisfy three conditions: "[f]irst, the writing must be made in the regular course of business; second, it must be prepared within a short time of the act, condition or event being described. Finally, the source of the information and the method and circumstances of the preparation of writing must justify allowing it into evidence."

[State v. Sweet, 195 N.J. 357, 370 (2008) (quoting State v. Matulewicz, 191 N.J. 27, 29 (1985)).]

"The purpose of the business records exception is to broaden the area of admissibility of relevant evidence where there is necessity and sufficient guarantee of trustworthiness." Liptak v. Rite Aid, Inc., 289 N.J. Super. 199, 219

(App. Div. 1996). "The rationale for the exception is founded upon the theory that records which are properly shown to have been kept as required normally possess a circumstantial probability of trustworthiness, and therefore ought to be received in evidence." Ibid. A statement is reliable where the "declaration is so recorded is under a duty, in the context of the activity in which the record is made, to make an honest and truthful report." State v. Lungsford, 167 N.J. Super. 296, 309 (App. Div. 1979).

It is well settled that a police report is generally "admissible as a record of a regularly conducted activity, commonly known as a business record, N.J.R.E. 803(c)(6), and as a public record, N.J.R.E. 803(c)(8)." Manata v. Pereira, 436 N.J. Super. 330, 345 (App. Div. 2014). Such reports may be admissible to show, for example, a person spoke to an officer, ibid., or that a report of a crime was made and the time of the report, Lungsford, 167 N.J. Super. at 310. Our Supreme Court has explained, however, that "police officers who draft reports have an interest in prosecuting defendants," and held, therefore, that a police report containing "factual statements, observations, and the officer's opinions" constituted "inadmissible hearsay outside the scope of the business records exception." State v. Kuropchak, 221 N.J. 368, 388-89 (2015); see also State v. Mosley, 232 N.J. 169, 191 (2018) ("A police report . . . prepared in the

context of an investigation and recounting subjective events in a narrative form, is not a document that fits into any exception to the hearsay rule.").

Where the business record at issue is a police report, "[i]f the police officer who wrote the report is unavailable, any other police official who could state that the report was a record made in the regular course of the officer's duties and was made at or near the time of the event may establish the report's admissibility." Dalton v. Barone, 310 N.J. Super. 375, 378 (App. Div. 1998). The declarant who records the information in the report, however, must have had a "'business' duty to communicate it truthfully." Lungsford, 167 N.J. Super. at 309.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both provide that the accused in a criminal trial has the right to confront the witnesses against him. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. "[T]he Confrontation Clause of the United States Constitution bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" State v. Slaughter, 219 N.J. 104, 116-17 (2014) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). Testimonial statements are defined as "those 'objectively indicat[ing]

A-2811-19

that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" State ex rel. J.A., 195 N.J. 324, 329 (2008) (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)).  Generally, the Confrontation Clause forbids the admission of testimony that is directly or indirectly derived from a non-testifying witness and incriminates a defendant.  State v. Branch, 182 N.J. 338, 350 (2005).

The right of confrontation, [however] . . . may be waived by the accused. State v. Williams, 219 N.J. 89, 98 (2014).  "Because counsel and the defendant know their case and their defenses, they are in the best position to make the tactical decision whether to raise a Confrontation Clause objection."  Id. at 99. "[T]he defendant always has the burden of raising his Confrontation Clause objection."  Ibid. (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 327 (2009)).  "It is the defendant's choice "to assert (or forfeit by silence) his Confrontation Clause right."  Ibid. (quoting Melendez-Diaz, 557 U.S. at 326).

In Henderson, 208 N.J. at 227-28, our Supreme Court set forth a modified framework to evaluate eyewitness identification evidence.  The Court canvassed a variety of factors that scientific studies have shown may confound what otherwise might appear to be an eyewitness's reliable identification of a criminal

wrongdoer.  Id. at 218.  These confounding factors include "system variables" (factors within the control of the criminal justice system, such as suggestive aspects of lineup and photo array procedures), and "estimator variables" (factors outside of the control of the criminal justice system, such as the distance between a victim and an assailant, poor lighting, stress, personal characteristics, and memory decay).  Ibid.

In its evaluation of the system variable "avoiding feedback and recording confidence," the Court emphasized that "to the extent confidence may be relevant in certain circumstances, it must be recorded in the witness' own words before any possible feedback."  Id. at 254.  As such, Henderson requires law enforcement officers to "make a full record—written or otherwise—of the witness' statement of confidence once an identification is made."  Ibid.  More recently, our Supreme Court set forth specific standards for preservation of identification procedures.  State v. Anthony, 237 N.J. 213, 230-31 (2019).  Anthony now requires identification procedures to be electronically captured in "video or audio format."  Id. at 231.

Rule 3:11(b) also requires police to "electronically record the out-of-court identification procedure in video or audio format, preferably in an audio-visual format."  The Rule specifically requires the record to include "a witness'

statement of confidence, in the witness' own words, once an identification has been made." R. 3:11(c)(9). It also provides a remedy in the event the record is lacking in important required details if it would have been feasible to obtain and preserve those details. R. 3:11(d). In such cases, "the court may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification." R. 3:11(d).

Here, the statements contained in the detectives' reports explaining that the eyewitnesses were "confident" in their photo selections were inadmissible hearsay without an applicable exception. The statements were made out of court and offered for their truth, White, 158 N.J. at 238, and were not admissible under the business records exception because they were prepared for the purpose of prosecution, Kuropchak, 221 N.J. at 388-89. Further, the failure to record statements of the eyewitnesses' confidence at the time of the photo arrays violated Henderson, 280 N.J. at 254 and Rule 3:11(c)(9). No Confrontation Clause violation occurred, however, because defendant's failure to object constituted an implicit waiver of his right of confrontation. See Williams, 219 N.J. at 99.

In light of these improprieties, we conclude the testimony should not have been admitted. We also recognize that it created a risk of prejudice to defendant by bolstering Fadare's and Giwa's photo array identifications and reducing the adverse impact of the somewhat vague descriptions of the shooter they provided in court and on the day of the murder. We acknowledge, however, that the prejudicial effect of the testimony was limited because the State played video recordings of both photo array procedures at trial, allowing the jury to draw its own conclusions regarding Fadare's and Giwa's confidence in their photo selections.[4]

## VI.

Finally, defendant argues that the aggregate effect of the various trial errors raised on appeal deprived him of his constitutional right to due process and a fair trial. We agree.

"When legal errors cumulatively render a trial unfair, the Constitution requires a new trial." State v. Weaver, 219 N.J. 131, 155 (2014). "[W]here any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant

---

[4] We note that, because the prejudice of this error was likely limited in light of the jury's ability to evaluate Fadare's and Giwa's confidence in their identifications, this error would not support a remand standing alone.

was not accorded a fair trial, it becomes the duty of this court to reverse." Ibid. (alteration in original) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)); see also State v. Jenewicz, 193 N.J. 440, 473 (2008) ("[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal.").

Determining whether the cumulative effect of trial errors deprived a defendant of a fair trial necessarily requires weighing the strength of the State's case against the prejudicial effect of the complained of errors. Here, we do not doubt that the State presented sufficient evidence to support defendant's conviction. However, as noted, the State's proofs establishing defendant's identity as the man who shot Olabode were not unassailable. In particular, Fadare's and Giwa's vague descriptions of the shooter, which did not include him wearing yellow, Hall's repudiation of her prior statement, and the testimony describing Fadare and Giwa being in "shock" after witnessing their friend's murder all raised reasonable questions regarding the evidence identifying defendant as the shooter.

Detective Green's improper testimony effectively eliminated any weaknesses in the State's proofs identifying defendant. He was permitted to

improperly resolve the discrepancies between Hall's statement describing defendant's clothing and Fadare's and Giwa's descriptions of the shooter by stating that he could tell that the shooter was wearing a yellow shirt under a hooded sweatshirt in the surveillance video. Detective Green also remedied the vagueness of Fadare's and Giwa's descriptions and the possibility that their memories might have been impacted by the stress of viewing their friend's murder by stating that defendant matched the description they provided.

In addition, the admission of Detective Green's testimony opining that the South 20th Street residents feared defendant and implying that he possessed and distributed marijuana further prejudiced defendant. That testimony inappropriately suggested defendant's guilt based on a propensity for wrongdoing and violence.

Indeed, Detective Green's testimony implying that defendant possessed materials used for packaging controlled dangerous substances suggested that he was a drug dealer. Further, by suggesting that the South 20th Street residents witnessed the shooting and failed to cooperate with the investigation because they knew defendant and feared he would retaliate against them, Detective Green not only implied that defendant was extremely violent, but also that his violent nature was common knowledge in his community. Viewed in the

39

aggregate, these errors deprived defendant of a fair trial and, therefore, compel us to reverse his conviction. Weaver, 219 N.J. 155.

Reversed and remanded to the trial court for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2811-19